Roscoe. Thank you. Okay. Okay. Okay. Council, you can take the podium. Thank you. May it please the Court, my name is Lawrence Karras. Seated next to me is Mr. Carl Irace. We appear before the Court today seeking that contour of Mr. Carrasco's plea and sentence and request that the matter be transferred back to the Easton District. In essence, the issue before the Court today is whether or not Mr. Carrasco suffered from ineffective assistance of counsel, most particularly at the time he imposed his plea of guilty to a violation of 26 U.S.C. 7-6. He took a plea. He pled guilty, correct? Yes, he did, ma'am. He pled guilty. Are you arguing that if he had known of the immigration consequences of that plea that he would have gone to trial? Well, quite frankly, the important aspect of the question is, if Carrasco had known that he was pleading guilty to an aggravated felony as opposed to a mere felony, the aggravated felony has the contingency of automatic deportation or mandatory deportation. I know that and you know that, but it appears his lawyer didn't know that at the time. Well, there is a declaration submitted by his then counsel, Your Honor, who admits very candidly that he did not consult with an immigration attorney, that he had misadvised to Mr. Carrasco, and most importantly that these . . . Was that issue raised before the District Court? Those declarations came in on appeal, right? I understand that. I understand that an outline, in a sense, has been provided by Doe v. United States most recently two weeks ago. I think the important aspect of that is, is the court has indicated . . . Did it specifically say that . . . raise at least the possibility of automatic removal? Yes, Your Honor. And right there, that's the main issue, the fact that when one talks about a possibility, a possibility is not finality. Even when there's an aggravated felony and there is mandatory deportation, isn't there still a possibility of some relief? There is no possibility of that relief other than . . . An application under the Convention Against Torture? That would be the only viable option, which does not exist. It's not a possibility. Well, that is a . . . I mean, one of the problems is in taking a guilty plea, I would be reluctant to say to a defendant, you have no chance of relief. I would be reluctant to say that. Even when there's automatic deportation, there's at least a possibility, it might be a very slight possibility, of an application of some kind. Is that not so? It could be so. There's a small scintilla of hope that if you have the right country out of the 102 countries in the world . . . If there is a small scintilla of hope, then would it be appropriate for the district judge to say you have no hope? No. Absolutely not, because what you're doing is you're going beyond the statutory interpretations now. And, in essence, what happens is the code says it, the book says it, as Padilla says, if it's in the book, you have to advise your client as to what you should know at that time. And, what Mr. Wallenstein knew at that time, as professed within his declaration, is that he didn't know that this plea was going to be to that aggravated felony. And, he never informed his client that by pleading to this aggravated felony, he's subject to automatic deportation or automatic removal. The fact that there may be a fly in the ointment, one out of a thousand times, the counsel never even explored that. So, even if one were to say there's a possibility, he never raised the fact of that fly in the ointment or that scintilla. He gave him misadvice. The Supreme Court's decision in Lee, which says there should be some indication during the proceedings that remaining in the United States is important to the defendant. Okay. Is there any such indication in the record? If I may, Your Honor, J. Lee says that. Their most recent decision in Doe says that. But, the problem becomes when your counsel advises you that you are going to take a plea that will not subject you to automatic deportation and that there is a possibility. Doe and Lee recognized that there must be some indication that remaining in the United States is important to the defendant. Is there any such indication in this record? There is. And, what's that? And, those are Carrasco's declaration and defense counsel's declaration. But, in fairness, you really can't protest something when you're getting a good deal. If I take you to Carvel and I give you vanilla ice cream, you don't know you can ask for a brown bonnet. You're taking that situation based upon a professional's advice. And, most importantly, the court in J. Lee and the court in Doe, which provides a real outline in a sense as to how this court views these matters, said, contemporaneous is tough to do, especially if you're relying upon your advice of counsel. You've asked him over and over again, I'll be okay. He says you'll be okay in Doe. In our case, he says you'll be all right. So, he believes what the counsel gives him. Further, the court, in an effort to try and resolve this contemporaneous activity, which is difficult to demonstrate, says, wait a minute. Let's take a look at the background. Who is this person? Does he have a reason to be concerned about immigration consequences? And, in my particular case with Mr. Carrasco, he's been here 30 years. His brothers, three brothers, are citizens of the United States. His sister is a citizen of the United States. He went to Ecuador once in 2013 to visit one brother. His daughter, who went to college in Ecuador, is back here in the United States. He has nothing whatsoever to do with Ecuador. He'd much rather take the risk of either a better plea or going to trial on a Hail Mary or rolling the dice, if that's what it must be. But, interestingly, this court looked at the deposition — I'm sorry, the declaration submitted, and then it turned its attention to the background of the individual, and then it took a look at the Rule 11 hearing. Now, when we look at Carrasco, Carrasco not only has the benefit of the words possibility emanating from his counsel, the court, the AUSA, the probation report itself, and defense counsel's submission to the sentencing report itself. All of those factors talk about possibility. No one tells him, you've pled to an aggravated felony, you are being deported. None of that appears anywhere. This is a 49-year-old iron worker. To think that he is then going to query with his counsel, after asking three or four times, I don't want to be deported, get me something that will not get me deported and I can live with that. If I have to go to jail for a period of time, so be it, but I'll be in the United States. In essence, what happens here is defense counsel fails him, his misadvice causes prejudice to Mr. Carrasco, and that prejudice is the dire consequence of deportation. And in fairness, when everybody talks about possibility, possibility is nowhere near finality. The great quote is, if you hear that when you're driving to the airport and you're taking your wife on a plane, you think to yourself, oh, and you have your children with you, oh, I hope the plane doesn't crash. But you dismiss that fact. However, if you're standing in the airport and the pilot is looking at the plane and he comes up the stairs shaking his head and he tells you, I wouldn't get on that plane, would you get on that plane? No, you wouldn't, because possibility has moved to finality and you wouldn't take that chance. Here, Mr. Carrasco never knew the ramifications and consequences of what he had pled to. And the system failed him. This could have been rectified, and it wasn't. Contemporaneous is hard to demonstrate. I understand that, Your Honor. But I would ask this Court to invoke the principles that it utilized in Doe to come to the realization or the reality that this man wanted to remain in the country, and that was his determinative factor in taking a plea which he believed rewarded him as such. He would have never taken this plea or followed with the sentence had he known the ramifications of that plea. Thank you, Counsel. Thank you, Your Honor. Will I rebuttal after we hear from the government? Yes, ma'am. Good morning. For the United States of America, Amy Boussa and Charles Kelly, Assistant U.S. Attorneys. Judge Bianco here took a thorough plea. He incorporated the understanding of the plea agreement in the plea colloquy. Can I ask how come Judge Bianco, who knows the law, we know, didn't say this plea you are pleading to an aggravated felony and you will be deported? Why didn't he say that? Because it's just not accurate that you will be deported. There are exceptions. There are S visas that our office through ICE gives out to certain defendants. There's the Convention Against Torture, as Judge Chin mentioned earlier. There are exceptions to that. No one can guarantee what's going to happen with regard to a defendant in the immigration proceedings. With exceptions not relevant here, you will be deported. He could have said that. That would have been an accurate statement. With exceptions not accurate here? Not relevant here. I don't think the district judge ever knows whether an S visa is relevant or applicable unless it happens to be a section of the plea agreement. What is an S visa? S visa is a cooperator's visa. There's S visas, then there's T and U visas. I'm sorry? He wasn't cooperating. He did the offense and he admitted it. He did the offense, he admitted it, and he didn't take the next step to cooperate. There's no other conspirator on this claim, right? On this offense? We wouldn't know that, Your Honor, because he did not... There's no one he could cooperate against? We don't know if there were other people involved in that. He never cooperated, and so it's a tax evasion. He signed the documents. He was the one who took a million dollars in checks to the check casher and didn't report them on his income tax return, so we're not aware of other people being involved. Certainly we've had many tax evaders who have pled guilty and have cooperated against other people in their particular industry who follow the same course of conduct that they did in committing the criminality. It certainly wouldn't be unusual for a tax defendant to cooperate. He was advised in the plea agreement that this was a removable offense. He said to Judge Bianco that he read the plea agreement before he signed it, that he went through it with his attorney before he signed it, that he understood it before he signed it, and that he did understand it. And then Judge Bianco said, as a result of your guilty plea, you may be subjecting yourself to deportation or removal from the United States. And if that happens, if proceedings are instituted, you will not have an opportunity to get your plea back. Do you understand that's a potential consequence of your guilty plea? Do you understand that? The defendant says, yes, I understand that. And this case is on all fours with Fazio. In Fazio, the district judge talked about a risk of removal. Judge Bianco here talked about a potential consequence. Why isn't it on all fours with Doe? It's all fours with Doe? Doe had substantial distinctions. Doe had a defense. You didn't hear anything about a defense here. Doe had a foreseeability argument. Doe had an alternative plea. Doe had a way to break down the fraud, to say, I was involved with these six circumstances, I can plead to this one, and this is a low dollar amount. There's no way to break down a million-dollar tax evasion except by year. And when we break it down by year, the loss far exceeds the amount of $10,000. The loss here was $270,000, $180,000 for one year, $90,000 for another year. There are substantial losses. In Doe, it was close to the $10,000. So it was deceivable that there could have been discussions with the government to get the government to agree to a loss amount below $10,000. And as with any lesser member of a conspiracy, there were indications in the Doe decision that there were foreseeability defenses that there were defenses to involvement. Here there's no defense. As Judge Bianco said, it's $900,000 to a check casher. What defense are you talking about? This isn't misclassification of expenses. And in Doe, did the defendant raise the issue of being deported, the concern that he would be deported? Doe, the issue was raised, and that was a difference also. And Fazio, just like this. In Doe, what you had was the government giving constant assurances about deportation. Here the issue of deportation never came up, not in the plea allocution, not in anything else. What a contrast. In Doe, it was focused on the agents were working with Mr. Doe or Miss Doe, whoever, whatever gender the person may be, but they were working with the person. There was government involvement, government assurances. You had notification to the government. Just like in Kovacs, you had notification to the government. He wanted to take a plea that's rarely taken, misprision of felony, because his defense counsel, Mr. Fink, thought that that would be something that insulates him from deportation. And that plea was taken, but that plea did not insulate him from deportation or from an aggravated felony. And that's a significant difference when you look at those two cases. When you look at Doe, when you look at Kovacs, that's government being notified, government being involved in the situation, government being told he wants to take this unusual plea because he believes it will insulate him from deportation. And that's why you have a misprision of felony plea, because you have open discussions between the prosecutors and the defense counsel that the paramount concern is deportation. Nothing like that here. No discussions like that, no indication on the record, nothing contemporaneous. And as Judge Weinstein said, if these plea proceedings that are conducted, and this one in particular I referenced by Judge Bianco, are to have any meaning, and if these plea agreements and their recitals are to have any meaning, then they need to be upheld. There needs to be some finality with these plea agreements. The government would not oppose a remand for an evidentiary hearing? We don't think there's any need for a remand because the focus here on prejudice, there's no prejudice here as a matter of law. There's no contemporaneous conduct. There's no indication that immigration was the concern. At one point the government was willing to go along with the remand, I think. Yes, we were. But now that we've, yes, at this point we want this to proceed and to be decided on the issue of prejudice. The government believes there's no prejudice as a matter of law. The government was willing to explore whether there was objectively unreasonable conduct by the defense counsel through a hearing. But we don't think we need to reach that. Do you concede that he had ineffective assistance of counsel? No, Your Honor, no. What we concede is that if the court takes as true the affidavits here for purposes of deciding that, the court can see there's objectively unreasonable conduct. But we don't concede that. We believe that would require a hearing. We don't think this requires a hearing at all because we think Judge Bianco conducted a proper plea proceeding and that there's no prejudice here as a matter of law. There's no defense here. Isn't it a fact that even if what is alleged here is true, it could be that there are other things that are true, that there are other things that were said by counsel to the defendant that would cast a different light on it, on the question of whether counsel acted unreasonably and gave incorrect advice? Absolutely. I mean, a hearing could show that Mr. Wallenstein gave appropriate advice and that the full... In addition to even if what he said is true, even if his affidavit is correct, there could be other things that he said that would modify the ultimate conclusion. Because the affidavit may be fully accurate, but it may not be fully complete. That's right. There may be other things that were said. Do I understand you to be saying that if after the criminal proceeding, after the acceptance of the plea and the sentence, if he had then come to the government and offered cooperation about either this offense, which conceivably might have involved an aider and abetter or somebody giving criminal advice, or about some completely unrelated thing, he could have cooperated? And are you saying that by cooperating, if he had done so, the possibility was open that he would have escaped deportation? The possibility is that we have cooperators all the time who receive S visas, and S visas can eventually track so that they are insulated from deportation. He could have achieved that by . . . He could have achieved it. Typically, in my experience with the hundreds of tax defendants I've had, you'll have a tax defendant who will come in, someone, a baker, who's convicted of tax evasion at his bakery, and he'll come in and give us information about three competitors who he says do the same thing. They all have cash payrolls. They all do the exact same thing you're prosecuting me for. And it's not unusual for that to occur for tax evaders when it relates to an industry, and here it was a steel and iron works company, would come in and give us information about other people in the industry. It'll happen here in this case. Well, I'm sure it's . . . He could come in tomorrow and try to proffer some information. Yes. I mean, obviously it would have to be more current than the conduct that this case is based on because that would be time-barred even with the six-year statute that the IRS enjoys. Are there any other questions? Thank you. We'll hear a rebuttal from Mr. Arraiz. Two minutes. Thank you, Your Honors. This case is about prejudice. The prejudice in this case occurs at the moment of the misadvice that was never cured by unequivocal, accurate advice about deportation. The context of that prejudice is that legal advice. It was given by legal counsel. It was incorrect, and it tainted every decision Mr. Carrasco made, including the decision whether to enter the plea agreement. He answered Judge Bianco that he understood that there was a likelihood. Isn't that what he said? Judge Bianco read the Rule 11 admonishment, and it says, may be warned. That's what Rule 11 requires. But the case law, Padilla, among others, say that you have to have specific advice from your counsel, not from the court. That would be a curative benefit that maybe could have helped, but the advice, the protections of the Sixth Amendment . . . Yes. What case says that? I think Padilla. I think Fazio. I think there's another case. In cases where deportation is nearly automatic, deportation must be reviewed by counsel, and that doesn't happen here. Wallenstein, the trial counsel, admits, I didn't look into this. And after this advice from Wallenstein, from the trial counsel, where he . . . it's equivocal. You should be all right. The question, I think, becomes, even assuming that defense counsel doesn't review that this is an aggravated felony and that deportation is mandatory, is there prejudice when the plea agreement says you are subjecting yourself to automatic deportation and the court says that you may be deported with whatever language Judge Bianco says? Is there an indication in the record that the defendant would have done something differently if defense counsel had had those discussions? Yes, the declarations from trial counsel. Well, again, that's post hoc. Is there anything that was in the trial court record? What is in the trial court record is the continued equivocal advice that was supposed to be unequivocal and certain. Carrasco says, trial counsel told me I would be all right. Trial counsel said, there's a possibility of relief, and I never told him he was mandatorily deportable. The plea agreement says, may have consequences. Rule 11 says, may be removed. Bianco read Rule 11, may be removed. And then in Doe, trial counsel said, should be okay. And the Rule 11 admonishment said, may be. Those are all equivocal. And what we have in Carrasco is unequivocal advice that's inconsistent with the protections of the Sixth Amendment. This exact advice is being given every day, in every courthouse, everywhere. And I think that the practitioners and the trial court judges could really benefit from advice on this, what we have from the Second Circuit. What we have here is something that happens so routinely in ordinary practice, and it may not be what Mr. Carra and I do when we advise our clients, but this type of equivocal advice is going on everywhere, and it creates exactly this type of harm, where you have somebody who retains counsel, put yourself in Mr. Carrasco's shoes, where he's asked for, received, and relied upon encouraging advice from his trial counsel about the risks of deportation. He relied on that, thinking, I'll get to live another day. I'll get to fight this out in immigration court after this is resolved, and I've been told I should be okay. Put yourself in his shoes, and you see how this is a big problem for him. That's prejudice. A problem is prejudice. Thank you. Thank you. Thank you both. We'll reserve decision.